UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL SMITH, on behalf of himself and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS J. DART, SHERIFF OF COOK COUNTY, and COUNT OF COOK, ILLINOIS, a unit of local government as joint employer and indemnitor,<br><br>Defendants. | No. 25 CV 480<br><br>Judge Georgia N. Alexakis |

MEMORANDUM OPINION AND ORDER

Plaintiff Michael Smith, a former Cook County correctional officer, sued Sheriff Thomas J. Dart and Cook County, Illinois, for failing to pay overtime required under the Fair Labor Standards Act ("FLSA") and the Illinois Minimum Wage Law ("IMWL"). Smith seeks to represent similarly situated correctional officers in an FLSA collective and a class under Federal Rule of Civil Procedure 23. Defendants now move to dismiss Smith's first amended complaint. [30]. For the reasons given below, that motion is granted.

I.  **Legal Standards**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the

plaintiff's favor (as the Court does in the section that follows), but a court need not accept legal conclusions or "threadbare recitals" supported by "conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Background

Smith worked as a correctional officer for the Cook County Sheriff's Department[1] from March 2022 until February 2023. [17] ¶ 7. Cook County correctional officers perform duties that "include overseeing the inmates, ensuring the safety and security of the correctional facilities, and monitoring the activities in the correctional facilities." *Id.* ¶ 23. Smith was an hourly, non-exempt employee who worked a standard schedule of five days per week. *Id.* ¶ 24.

Unsurprisingly, correctional facilities must be staffed by correctional officers 24 hours per day, every day of the year. *Id.* ¶ 25. To facilitate this coverage, correctional officers work in three 8-hour shifts. *Id.* ¶ 26. They are required to arrive on time with all equipment and are disciplined if late. *Id.* To maintain safety and security, correctional officers "are required to maintain constant vigilance and monitor the actions of others as soon as they arrive at the facility." *Id.* They also "have a duty to act and address [safety or security] issues no matter the location and time of day that it occurs, including before their paid shifts begin and after they end." *Id.* ¶ 25.

---

[1] Defendants admit in their answer that Smith was jointly employed by Sheriff Dart and Cook County in this role. [11] ¶ 13.

Smith alleges that certain activities the correctional officers are required to engage in before and after their shifts, as well as during their lunch breaks, are uncompensated work. When correctional officers arrive at the facility, they are required to wait in line before being called to a secure desk for an initial check-in. *Id.* ¶ 30. Once called, the correctional officers sign into a logbook and surrender any firearms they have, which are then stored securely. *Id.* This process of waiting, signing in, and firearm storage takes 5 to 15 minutes, "depending upon the number of people waiting in line." *Id.* Smith does not allege that defendants required correctional officers to possess firearms or that personal firearm possession was otherwise related to correctional-officer work duties.

After this check-in, correctional officers walk to a security screening location 3 to 5 minutes away, where they "undergo a security screening to ensure that they do not inadvertently bring contraband or anything harmful into the facility." *Id.* ¶ 31. This screening includes emptying pockets and bags, removing shoes and belts, submitting personal items for inspection, walking through a metal detector, and sometimes undergoing additional inspection. *Id.* ¶¶ 32–33. The screening takes 5 to 15 minutes per day "and could be longer depending upon the number of people in line or if metal objects are found." *Id.* ¶ 35.

The check-in and screening are both conducted in non-public areas. *Id.* ¶¶ 30–31. Smith alleges that these pre-shift activities were "necessary to the principal work performed by" the correctional officers, that they were "controlled and required by

3

Defendants," and that they were "undertaken primarily for the benefit of Defendants." *Id.* ¶ 39.

Following check-in and screening, correctional officers then walk 3 to 5 minutes to get to roll call, where they actually "clock-in" for the day. *Id.* ¶¶ 35–36. In total, these pre-roll call activities take up 16 to 40 minutes per day, all of which were required by defendants and all of which were uncompensated. *Id.* ¶¶ 36–38.

Smith also alleges that correctional officers are "required to perform significant post-shift work that is uncompensated." *Id.* ¶ 54. Correctional officers must return equipment at a central location after their shifts and then "undergo the same security screening that they completed before the start of their shifts." *Id.* ¶¶ 54–55. This is in part to ensure that the correctional officers do not inadvertently take equipment, such as keys to prison cells or radios, with them when they depart. *Id.* ¶ 59. But if an alarm sounds while correctional officers are walking to return equipment, "they are required to immediately respond to the emergency." *Id.* ¶¶ 54, 57. Correctional officers also must wait in line to retrieve any firearm they stored at the beginning of their shift. *Id.* ¶ 56. Smith alleges these post-shift activities "normally lasted 20–35 minutes," *id.* ¶ 62, and, for slightly varying reasons, each activity "is predominately for the benefit of Defendants," *id.* ¶¶ 58–59. Smith does not provide specific time breakdowns for each phase of the post-shift activities, but as described in the complaint, these activities are essentially the pre-shift activities in reverse, so the Court infers the time for each counterpart phase is similar.

4

Next, Smith alleges that while correctional officers received a one-hour meal period, this was "primarily for the benefit of Defendants" and thus, Smith argues, counted as compensable work time. *Id.* ¶¶ 75–76. Correctional officers are required to keep their radios with them at all times, including meal breaks, to respond to emergencies such as inmate fights or security breaches. *Id.* ¶ 76. Correctional officers are also "frequently contacted through the radio during the meal period to respond to questions from [] supervisors" and are "required to monitor inmates even during their meal breaks." *Id.* ¶¶ 77–78.

Smith further alleges that certain non-discretionary bonuses issued to correctional officers—"like the roll call bonus"—were not factored into the regular rate of pay for the purpose of paying overtime. *Id.* ¶¶ 79–83. (Smith does not explain what the roll call bonus is.)

As a result of all this, Smith alleges that he and other correctional officers worked more than 40 hours per week but were not paid appropriate overtime wages for the hours worked beyond 40. *Id.* ¶ 85.

On January 15, 2025, Smith sued defendants in federal court for failure to pay overtime under both federal and state law. [1]. Smith later amended his complaint, and in the operative pleading, Smith seeks to represent both an FLSA collective and a class under Rule 23, with the following definition for both: "All current and former correctional officers and all other workers in similar positions, such as detention officers, who worked for Defendants at any time during the three year period prior to

5

the filing of this lawsuit to the present." [17] ¶¶ 95, 98. Defendants now move to dismiss. [30].

### III. Analysis

#### A. Fair Labor Standards Act

##### 1. Collective Bargaining Agreement

First, defendants argue that Smith's complaint does not demonstrate that he worked more than 40 hours in a week because he is a member of Teamsters Local 700 and that union's pertinent collective bargaining agreement ("CBA") puts meal periods outside the reach of Smith's FLSA overtime claim. [30] at 2–9. More specifically, according to defendants, the CBA provides for a weekly schedule of "35 hours of work time, plus 5 hours of paid meal break time," and that "[b]y seeking to litigate … his claim that his meal break hours were not actually 'break' hours, but work hours, Plaintiff seeks to dispute whether Defendants fulfilled their CBA obligations." [30] at 6. Defendants maintain that Smith cannot use this lawsuit as a vehicle for that challenge given the CBA's supplied grievance process. *Id.* at 7–8. For his part, Smith counters that defendants seek to advance affirmative defenses that he need not have pleaded around in his complaint and that, in any case, he is entitled to pursue his FLSA claim regardless of the existence of a CBA. [35] at 7–11.

To support their position, defendants submit a copy of the CBA, [30-1], and ask the Court to account for it when resolving their motion, [30] at 2, n.2; [40] at 3. "Generally, a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment." *See Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018); Fed. R. Civ. P. 12(d) ("If, on a

6

motion under Rule 12(b)(6) … matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The Seventh Circuit has instructed that there are three exceptions to this general rule: "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

The CBA was not attached to the complaint or referenced in it. But defendants note that "[t]he Teamsters CBA is published on an official website maintained by the County." [40] at 3.[2] The Court may take judicial notice of a CBA in such circumstances and does so here. *See Outley v. City of Chicago*, 407 F. Supp. 3d 752, 767 (N.D. Ill. 2019) (citing *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 648 (7th Cir. 2011)). Defendants concede that Smith "does not expressly allege his Teamsters membership." [30] at 2 n.2. But Smith has not argued that he is *not* subject to the CBA, and by its express terms, the CBA applies to "all employees of [the defendants] in the job classification[] of Correctional Officer." [30-1] § 1.1. The Court therefore concludes that the CBA applies to Smith and will consider it to evaluate his FLSA claims.

### 2. Meal Breaks

Defendants argue that Smith's meal breaks should not count for the purpose of determining overtime compensation because the CBA controls such breaks and defines them as outside of compensable work. [30] at 6–7. Defendants rely principally

---

[2] *See* https://opendocs.cookcountyil.gov/human-resources/labor-agreements/2020-2024/2020-2024_Teamsters_700_Correctional_Officers.pdf (last visited November 29, 2025).

on *Leahy v. City of Chicago, Ill.*, which instructs "that employers and employees may resolve whether certain activity is 'work' through a collective bargaining agreement, as long as the agreement comports with the FLSA." 96 F.3d 228, 232 (7th Cir. 1996).

The CBA provides the following:

> Each eight (8) hour work day shall include and be interrupted by a one (1) hour paid lunch break. In the event an employee is ordered not to take all or any part of his lunch break, the Employer shall give [that] employee … the option of either receiving a half hour (1/2) of additional pay or a full hour of compensatory time for doing so. This additional pay or compensatory time does not count towards an employee's 80-hour overtime threshold.

[30-1] § 3.2(A)(3). In *Leahy*—which involved a claim brought by law enforcement officers regarding work during their meal breaks—the equivalent collective bargaining agreement provision guaranteed that "[i]f an officer work[ed] more than eight hours in a day as a result of working during a meal period, the City will pay overtime rates for the excess work time." *Leahy*, 96 F.3d at 232. Because this provision complied with the FLSA, *Leahy* concluded that "the collective bargaining agreement can and does outright preclude the plaintiffs' claim." *Id.*

The Court reaches a similar conclusion here. Under § 3.2(A)(3) of the CBA, a correctional officer who has worked through her mealtime will be paid for the meal hour and has the option of receiving either an additional half-hour of pay—thus getting time-and-a-half compensation for the meal hour—or a full hour of compensation time. This is in fact more generous than the FLSA, since a correctional officer working through a meal can receive time-and-a-half for that hour whether or not she reaches 40 hours in a week. *See* 29 U.S.C. § 207(a) (employee generally

entitled to "compensation for his employment in excess of [40 hours per workweek] at a rate not less than one and one-half times the regular rate at which he is employed."). Thus, as in *Leahy*, the Court concludes that the CBA is a defense to FLSA liability regarding the meal periods.

Smith argues that the CBA is effectively an affirmative defense that he need not have pleaded around. [35] at 7. It is true that in general "complaints need not anticipate affirmative defenses," *Levin v. Miller*, 763 F.3d 667, 671 (7th Cir. 2014), but "dismissal is appropriate [] when the factual allegations in the complaint unambiguously establish all the elements of the defense," *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). In light of the CBA, of which the Court has properly taken judicial notice, Smith has alleged sufficient facts to establish that the CBA applies to his meal periods and puts them outside of any overtime calculation for the purpose of his FLSA claim.

### 3.   29 U.S.C. § 207(k)

Next, defendants argue that Smith's overtime would not start at 40 hours because, as law enforcement officers, Smith and other correctional officers are subject to 29 U.S.C. § 207(k), which the parties agree would require 42.75 hours of regular-time work before overtime began. [30] at 5–6; [35] at 4. Section 207(k) applies where "there is an established 'work period' that satisfies certain other statutory criteria." *See Wood v. City of Elgin*, 07 C 05418, 2008 WL 151382, at *2 (N.D. Ill. Jan. 14, 2008); *Barefield v. Vill. of Winnetka*, 81 F.3d 704, 709 (7th Cir. 1996) ("Section 7(k) permits public agencies to establish a 'work period' that lasts from seven to 28 days for employees engaged in law enforcement or fire protection activities."). It is the burden

9

of the defendant to show that it has established a work period that would implicate the § 207(k) exception. *Barefield*, 81 F.3d at 709.

Defendants again rely on the CBA to show that they have established a qualifying work period. *See* [30] at 6 ("Specifically, the Teamsters CBA establishes Plaintiff's work period, for [§ 207(k)] purposes, as a seven-day period."). The CBA does indeed establish such a work period. See [30-1] § 3.2(A)(2). The Court thus concludes that § 207(k) applies, and 42.75 hours in a week is the appropriate overtime threshold.[3]

### 4. Preliminary and Postliminary Activities

The Court now turns to the core of Smith's complaint: that the time correctional officers spend checking in and out, being screened, and walking from one location to another, both before and after they clock in and clock out of their shifts, is compensatory work time. *See* [17] at 2.

Defendants argue that under the Portal-to-Portal Act of 1947, 29 U.S.C. § 254(a), this time is not compensable. [30] at 11–12. The Portal-to-Portal Act provides, as relevant here, that employers are not required to pay employees overtime for "activities which are preliminary to or postliminary to [the principal activity or activities which such employee is employed to perform]." 29 U.S.C. § 254(a)(2). The

---

[3] The IMWL expressly adopts the § 207(k) exception, *see* 820 ILCS 105/4a(4), so for the purpose of the instant motion, 42.75 hours would be the overtime threshold for the IMWL claim as well. Smith himself does not contest that 42.75 hours in a week is the appropriate overtime threshold under § 207(k) and § 4a(4). He argues only that the Court should not consider the exemptions at this stage of the litigation (not what the overtime threshold would be if the Court did) and that, even if the Court were to consider the exemption, that he has properly pled that he worked more than 42.75 hours. [35] at 4.

10

Supreme Court has defined "principal activities" to include "all activities which are an integral and indispensable part of the principal activities.'" *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 33 (2014) (cleaned up). Examples of such activities include "the time battery-plant employees spent showering and changing clothes because the chemicals in the plant were toxic to human beings" and "the time meatpacker employees spent sharpening their knives because dull knives would slow down production on the assembly line, affect the appearance of the meat as well as the quality of the hides, cause waste, and lead to accidents." *Id.* at 34 (cleaned up).

In *Busk*, the Supreme Court concluded that mandatory security screenings undergone by departing Amazon warehouse workers to prevent employee theft were "noncompensable postliminary activities." *Id.* at 35. *Busk* reasoned: "Integrity Staffing did not employ its workers to undergo security screenings, but to retrieve products from warehouse shelves and package those products for shipment." *Id.* As a result, "[t]he screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment. And Integrity Staffing could have eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.* As *Busk* summarized: "an activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." *Id.*

The parties point to dueling post-*Busk* cases for the question of whether check-ins and security screenings of correctional officers are sufficiently intrinsic to their

11

employment duties. Smith relies on *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270 (10th Cir. 2020), in which the Tenth Circuit concluded "the time the [correctional] officers devote to undergoing the security screening is integral and indispensable to their principal activities." *Id.* at 1279. *Aguilar* reasoned that if the employer "were to forego officer screening, officers could inadvertently or intentionally bring weapons or other contraband into the prison" and "[t]he introduction of weapons or other contraband into the prison would most certainly result in a less secure prison." *Id.* Unlike the warehouse worker screenings in *Busk*, *Aguilar* concluded, the correctional officer screenings could not be eliminated "without impairing the employees' ability to complete their work." *Id.* at 1278 (quoting *Busk*, 574 U.S. at 35).

Defendants point to two other cases that, post-*Busk*, held that "correctional officers' time spent in pre-shift security screening is not compensable FLSA time." [30] at 13. First, *Henderson v. Cuyahoga County* concluded that *Aguilar* "improperly applie[d] *Busk*" and that correctional-officer screenings were not compensable. 1:20 CV 1351, 2020 WL 5706415, at *3 (N.D. Ohio Sept. 24, 2020[4]; [30] at 13. In a relatively abbreviated analysis, *Henderson* determined that "[w]hile the pre-shift security screening may relate to part of the activity Plaintiff performs during his shifts, *i.e.*, searching for contraband, the Plaintiff could still perform his job effectively if the pre-shift screenings were eliminated." *Id.*

---

[4] The Court reminds defendants that proper citations to electronic legal databases like Westlaw or Lexis include both the case number and the date of the dispositive decision being cited.

12

Second, defendants rely on *Gonzalez v. CoreCivic of Tennessee, LLC*, 116CV01891DADJLT, 2018 WL 4388425 (E.D. Cal. Sept. 13, 2018). [30] at 13. This citation is somewhat puzzling, as *Gonzalez* involved a motion for preliminary approval of a class action settlement were the *plaintiff* argued that the screening time was not compensable under the FLSA. 2018 WL 4388425, at *5. *Gonzalez* ultimately disallowed the proposed FLSA claim in the settlement where "the inclusion of an FLSA claim only arose after the court observed at oral argument on the pending motion that the settlement agreed to release FLSA claims, even though none had been alleged in the complaints." *Id.* at *4. And while the court in *Gonzalez* "accept[ed] plaintiff's stated belief [in supplementary briefing] that there was no value to any FLSA claims," it did so without searching inquiry. *Id.* at *5; s*ee also id.* n.1 (observing that *Busk* might be distinguishable from the facts involved in *Gonzalez*, but adding this "is not a question the court must resolve at this time"). Defendants' description of *Gonzalez* as "subsequently [holding] that correctional officers' time spent in pre-shift security screening is not compensable FLSA time," [30] at 13, thus significantly overstates the case.

More helpful to the Court is *Medrano v. United States*, 159 Fed. Cl. 537 (Fed. Cl. 2022). *Medrano* faced the same issue of preliminary security screenings for correctional officers and concluded, in resolving a motion to dismiss, that "[a]lthough the issue is complicated … [the correctional officers] have not stated a plausible claim for compensation for that time." *Id.* at 545. The key was that while "*searching* for contraband is allegedly one of Plaintiffs' job duties … it does not follow that *being*

13

*screened* to ensure compliance with contraband rules is an intrinsic part of Plaintiffs' job." *Id*. "Plaintiffs can search for contraband even if they themselves are not screened. The acts are distinct in every way." *Id*. The Court agrees.

To the extent that "[t]he introduction of weapons and other contraband … would most certainly result in a less secure correctional facility and would impair the correctional officers' ability to provide security, supervise the inmates, and search for contraband," [17] ¶ 42, "it is not the *screening* that makes it possible for Plaintiffs to do their jobs, but following prison rules that forbid contraband." *Medrano*, 159 Fed. Cl. at 545–46. The screening may provide a backstop, but it is "two steps removed from the productive activity" and therefore not compensable. *Busk*, 574 U.S. at 34 (cleaned up). The pre-shift activities Smith alleges therefore do not represent compensable work time and cannot be counted towards the overtime threshold.

*Aguilar* also separately addresses post-shift activities, 948 F.3d 1270 at 1280, and while the Court finds this analysis more persuasive, it is not enough to save Smith's FLSA claim. As in the instant case, the correctional officers in *Aguilar* were required to return equipment at the end of their shifts, including keys. *Id. Aguilar* reasoned that "these processes help ensure that inmates do not obtain possession of keys or equipment and thus are necessary to maintain the security of the prison," *id.*, and concluded "that checking keys and equipment in and out of the prison's inventory-control systems is integral and indispensable to the officers' principal activities of maintaining custody and discipline of the inmates and providing security." *Id*. at 1283. The Court agrees with *Aguilar* that something like returning

14

keys and equipment is sufficiently intrinsic to the job of a correctional officer, at least as presently alleged, that these activities would count as compensable work time.

However, "a claim for overtime wages is plausible *if the plaintiff's factual allegations support a reasonable inference* that there was at least one workweek in which he worked more than forty hours and did not receive overtime pay," *Frisby v. Sky Chefs, Inc.*, 19 C 7989, 2020 WL 4437805, at *5 (N.D. Ill. Aug. 3, 2020) (citing *Hirst v. Skywest, Inc.*, 910 F.3d 961, 966 (7th Cir. 2018)) (emphasis added), though "plaintiffs need not necessarily plead specific dates and times that they worked undercompensated hours." *Hirst*, 910 F.3d at 966. And again, since the § 207(k) exemption applies here, Smith must actually allege that he worked 42.75 hours in at least one workweek without overtime compensation.

Smith does not provide as precise a breakdown of the post-shift activities as he does of the pre-shift activities. He alleges that the post-shift activities, in total, "normally lasted 20-35 minutes." *See* [17] ¶ 63. Taking the high end of that estimate leads to a weekly expenditure of 175 minutes (35 minutes multiplied by 5), or 2 hours and 55 minutes. But some of this post-shift time includes security screenings which, based on the allegations concerning pre-shift activities, can account for at least 16 minutes per day, *id.* ¶¶ 30–35, and as the Court has already discussed, would not count as compensable work time under *Busk*. Thus, the Court infers that the actual amount of compensable time alleged for post-shift activities would be less than 2 hours and 55 minutes. Since, as discussed above, the CBA properly puts Smith's meal

15

periods out of the overtime calculation, this is not enough to reach even the 40-hour threshold, let alone the 42.75-hour threshold.

Smith has thus not adequately alleged an overtime violation under the FLSA. And because he has not done so on his own behalf, he cannot do so on behalf of a collective. [30] at 16.

### B. Illinois Minimum Wage Law

Defendants make a variety of arguments against Smith's IMWL claim. *See, e.g.*, [30] at 4–5, 8–9. But at this juncture, the Court's jurisdiction over his state-law claim relies on the supplemental jurisdiction granted by 28 U.S.C. § 1367. [17] ¶¶ 5, 7. Because the Court dismisses the FLSA claim over which it has original jurisdiction, it declines to exercise supplemental jurisdiction over the remaining state law claim. 28 U.S.C. § 1367(c)(3).

In an earlier filed status report (although not in an actual motion), Smith requested that this Court stay its resolution of defendants' motion to dismiss in light of *Johnson v. Amazon.com Services, LLC*, Appeal No. 24-1028 (7th Cir.), in which the Seventh Circuit certified the following question to the Illinois Supreme Court: whether the IMWL incorporates the exclusion from compensation for employee activities that are preliminary or postliminary to their principal activities, as provided under the Portal-to-Portal Act. [41]; [41-1] at 21. The request for a stay is moot where the Court elects not to exercise jurisdiction over the IMWL claim.

Finally, because the Court declines to exercise jurisdiction over Smith's individual IMWL claim, it does not address defendants' request that his class action allegations be stricken. [30] at 16–20.

16

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss [30] is granted as to plaintiff's FLSA claim, brought both on Smith's behalf and on behalf of a proposed collective. The Court declines to exercise supplemental jurisdiction over the remaining IMWL claim.

Smith's first amended complaint [17] is dismissed without prejudice, although Smith may refile a second amended complaint if he can cure the deficiencies identified with his FLSA claim while still complying with his obligations under Federal Rule of Civil Procedure 11. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss.").

Any second amended complaint is due on or before 12/15/25. If Smith does not submit an amended complaint by 12/15/25, the dismissal of the FLSA automatically will convert to a dismissal with prejudice, the Court will relinquish jurisdiction over the IMWL claim, and the case will be terminated.

---

Georgia N. Alexakis
United States District Judge

Date: 12/1/25